Larry ZERANGUE and Leon B.
Carriere, Plaintiffs-Appellants
Cross-Appellees,

v.

TSP NEWSPAPERS, INC.,
Defendant-Appellee
Cross-Appellant.

No. 86–4189.

United States Court of Appeals,
Fifth Circuit.

April 20, 1987.

Kermit A. Doucet, Lafayette, La., for Carriere.

William H. Goforth, Lafayette, La., for Zerangue.

Jack M. Weiss, Mary Louise Strong, Phelps, Dunbar, Marks, Claverie & Sims, New Orleans, La., for defendant-appellee cross-appellant.

Before WISDOM, JOHNSON, and GARWOOD, Circuit Judges.

JOHNSON, Circuit Judge:

In this libel case, two former law enforcement officials appeal the district court's grant of summary judgment in favor of the defendant newspaper company for failure to raise an issue of actual malice. The newspaper company cross-appeals the district court's denial of summary judgment on the issues of whether the publications were substantially true and the plaintiffs libel proof. We affirm the district court on cross-appeal but, finding a genuine question of material fact as to actual malice, remand for trial on that issue.

## I. BACKGROUND

In 1977, Leon B. Carriere was the Chief Deputy Sheriff, and Larry Zerangue was the Chief of Detectives in St. Landry Parish, Louisiana. TSP Newspapers, a subsidiary of the New York Times Company, publishes a local newspaper, the *Daily*

*World.* In December 1977, Danny Singleton, a convicted burglar serving time in the St. Landry Parish jail, was arrested for burglary outside the jail in Alexandria City, Louisiana. After an investigation revealed that Zerangue and Carriere had been releasing Singleton on weekends without authorization, they were indicted for the misdemeanors of malfeasance in office and public bribery. La.Rev.Stat.Ann. §§ 14:134 and 14:118 (West 1986). The malfeasance indictment charged that Zerangue and Carriere allowed Singleton to go free in violation of direct orders from the Sheriff; the public bribery indictment alleged that Singleton, in return, gave Zerangue and Carriere cash, clothing, jewelry, flowers, and a rental camper.

The Singleton affair aroused extensive coverage from local media, including the *Daily World.* Zerangue and Carriere lost their jobs; they were tried and convicted of malfeasance in April 1978. Each received a six-month jail sentence. The trial court subsequently quashed the public bribery indictment on double jeopardy grounds. In September, Zerangue and Carriere began serving time in the jail they formerly supervised. After two months, the state court suspended the balance of their sentences.

In March 1984, nearly six years later, Danny Singleton resurfaced as a witness in a grand jury arson investigation. *Daily World* reporter Steve LeBlanc, who covered the courts, wrote a twenty-three paragraph article on the subpoena, which was published on March 14, 1984. The headline announced "Singleton testifying before jurors," and the second paragraph stated:

> Singleton, a former Church Point resident whose testimony in 1978 led to the conviction of two St. Landry Parish deputies on charges of malfeasance, was subpoenaed, along with four other witnesses, to testify Tuesday.

Appellee's Record Excerpts at 28. Paragraphs seven, eight, and nine read:

> Singleton gained notoriety in 1978 as the key figure in a scandal in connection with which two St. Landry Parish Sheriff's deputies were convicted of malfeasance.

> Deputies L.B. Carriere and Larry Zerangue were convicted in May of 1978.

> The deputies were found guilty of granting Singleton, then a parish jail inmate, weekend passes in exchange for stolen goods Singleton obtained in various burglaries committed while out on weekends.

*Id.* LeBlanc testified, in a deposition, that he relied on his recollection of the earlier scandal in writing these paragraphs.

After the March 14th article appeared, Zerangue called Paul Sims, the *Daily World* editor, to protest errors. Sims asked Zerangue to specify the inaccuracy, and Zerangue pointed out that he and Carriere had not been convicted on the public bribery charge nor even indicted for receiving stolen things, a felony. La.Rev.Stat.Ann. § 14:69 (West 1986) (statute amended in 1982 to read "possessing stolen things"). Sims ordered LeBlanc to check court records, and, when those records confirmed the error, the March 15th *Daily World* printed the following retraction:

### CORRECTION

> A March 14 story in the Daily World indicated former sheriff's deputies L.B. Carriere and Larry Zerangue were convicted in 1978 of granting weekend passes to Parish Jail inmate Danny Singleton in exchange for stolen goods Singleton was convicted of taking burglaries [*sic*]. While both deputies were convicted of malfeasance, neither man was accused of having received stolen goods from Singleton. The Daily World regrets the error, but is happy to make the correction.

Appellee's Record Excerpts at 29.

The error was discussed at a staff meeting soon after March 14. Editors Paul Sims and Harlan Kirgan stated in deposition that all of the newsroom staff would normally be expected to attend such a meeting. However, neither of the two editors or Mary Dixon, a reporter who covered the police "beat," could remember whether Dixon was at that particular meeting or out of the office on assignment or other busi-

ness. Dixon herself testified that she did not remember hearing of the error.

In April 1984, Singleton was again arrested, for receiving stolen goods. Mary Dixon wrote a seven-paragraph article on the arrest for the April 11 edition. Midway through this article, the following paragraph appeared:

> [Singleton] was in the news previous to that in 1978 when he was a key figure in a scandal in which two St. Landry parish sheriff deputies were convicted of malfeasance. The deputies were found guilty of granting Singleton, then a parish inmate, weekend passes in exchange for stolen goods he obtained in break-ins.

Appellee's Record Excerpts at 30. Dixon testified that she obtained the information for this paragraph from the copy of LeBlanc's March 14th article in the *Daily World's* computer files. She stated that her computer search did not turn up the March 15th retraction and that she was not otherwise aware of the retraction. Editors Sims and Kirgan admittedly knew of the retraction. These editors testified, in depositions, that they could not remember which of them had edited Dixon's article and written the headline, but that neither noticed the error. After publication, however, LeBlanc noticed the error, and the *Daily World*, without a request, ran another retraction on April 12, 1984.

Zerangue and Carriere brought suit on August 13, 1984. On June 18, 1985, the district court denied a motion for summary judgment made by TSP Newspapers on the grounds that the articles were substantially true and that Zerangue and Carriere were libel proof. Extensive discovery ensued, including depositions from LeBlanc, Dixon, Sims, and Kirgan. On January 21, 1986, the district court ruled that Zerangue and Carriere were "public officials" obliged, under *New York Times v. Sullivan,* to prove "actual malice" on the part of TSP. 376 U.S. 254, 279–80, 84 S.Ct. 710, 725–26, 11 L.Ed.2d 686 (1964). The court then granted TSP's second motion for summary judgment, on the ground that Zerangue and Carriere had shown no issue of

fact on "actual malice." Zerangue and Carriere appealed.

## II. DISCUSSION

### A. *Public Officials*

■ Under *New York Times* and its progeny, a public official or public figure suing for libel must shoulder the heavy burden of showing that the defendants acted with "actual malice"—a burden that private figures need not meet. 376 U.S. at 279–80, 84 S.Ct. at 725–26. Zerangue and Carriere apparently concede, as they must under the case law, that they were public officials in 1977 when they served as law enforcement officers. *See, e.g., St. Amant v. Thompson,* 390 U.S. 727, 730, 88 S.Ct. 1323, 1325, 20 L.Ed.2d 262 (1968) (deputy sheriff); *McKinley v. Baden,* 777 F.2d 1017, 1021 (5th Cir.1985) (police officer). Nor do Zerangue and Carriere claim that the articles referred to any conduct of theirs not connected to their positions as public officials. The plaintiffs do argue that the passage of nearly six years between their discharge and the publication of the two articles had returned them to private figure status.

Zerangue and Carriere cite no cases holding that public official status erodes with the passage of time. Other courts have held that ex-public officials must prove that "actual malice" prompted speech concerning their in-office activities. *See, e.g., Rosenblatt v. Baer,* 383 U.S. 75, 87 n. 14, 86 S.Ct. 669, 677 n. 14, 15 L.Ed.2d 597 (1966); *Pierce v. Capital Cities Communications, Inc.,* 576 F.2d 495 (3d Cir.), *cert. denied,* 439 U.S. 861, 99 S.Ct. 181, 58 L.Ed.2d 170 (1978); *Arnheiter v. Random House, Inc.,* 578 F.2d 804 (9th Cir.1978). One court imposed the higher standard even though thirty years had passed since the plaintiff had left his official position. *Stripling v. Literary Guild,* 5 Med.L.Rptr.1958 (W.D. Tex.1979).

■ This Court sees no persuasive reason why Zerangue and Carriere's involuntary departure from their public positions should exempt them from meeting the *New York Times* standard when they sue for a news story on that departure. Moreover,

Carriere himself has stated that, at the time the articles were published, he was planning to run for political office. Appellants' Brief at 13. Thus, at least one of the plaintiffs has effectively admitted that he is still a "public figure" under *New York Times*. We hold that Zerangue and Carriere are public officials and must prove "actual malice" to recover.

### B. *Actual Malice*

■ In *New York Times*, the Supreme Court defined "actual malice" as "knowledge that [the publication] was false or . . . reckless disregard of whether it was false or not." 376 U.S. at 280, 84 S.Ct. at 726. That Court has further defined "reckless disregard" as a "high degree of awareness of probable falsity." *Gertz v. Robert Welch, Inc.*, 418 U.S. 323, 332, 94 S.Ct. 2997, 3003, 41 L.Ed.2d 789 (1974). A defendant will have such awareness if he "in fact entertained serious doubts as to the truth of his publication." *St. Amant*, 390 U.S. at 731, 88 S.Ct. at 1325. Despite a confusing use of the words "malice" and "reckless," "actual malice" cannot be proven by showing only ill will or negligence, even gross negligence, on the part of the defendant. *Garrison v. Louisiana*, 379 U.S. 64, 79, 85 S.Ct. 209, 218, 13 L.Ed.2d 125 (1964); *Time, Inc. v. Hill*, 385 U.S. 374, 387–88, 87 S.Ct. 534, 542, 17 L.Ed.2d 456 (1967). Instead, the inquiry focuses on the actual state of mind of the defendants. *Herbert v. Lando*, 441 U.S. 153, 170, 99 S.Ct. 1635, 1645, 60 L.Ed.2d 115 (1979); *New York Times*, 376 U.S. at 287, 84 S.Ct. at 730; *McKinley*, 777 F.2d at 1021.

■ Although the defendant's state of mind is a subjective fact, it can be shown by indirect or circumstantial evidence. *Herbert*, 441 U.S. at 165, 99 S.Ct. at 1643. Sufficient indirect evidence of actual malice can defeat a defendant's unsupported statement that he did act in good faith. *St. Amant*, 390 U.S. at 732, 88 S.Ct. at 1326; *Carson v. Allied News Co.*, 529 F.2d 206, 213 (7th Cir.1976). The Supreme Court has stated in dicta that reckless disregard could be found where, for example, a reporter fabricated a story out of his imagination,

based it on an "unverified anonymous telephone call," published "inherently improbable" statements, or had "obvious reasons to doubt the veracity of the informant." *St. Amant*, 390 U.S. at 732, 88 S.Ct. at 1326.

Turning to the fact patterns of the cases, we find courts refusing to find "actual malice" where the plaintiff has proved only that the defendant erred in interpreting its source (*Time, Inc. v. Pape*, 401 U.S. 279, 290, 91 S.Ct. 633, 639, 28 L.Ed.2d 45 (1971); *Long v. Arcell*, 618 F.2d 1145, 1148 (5th Cir.1980), *cert. denied*, 449 U.S. 1083, 101 S.Ct. 869, 66 L.Ed.2d 808 (1981)); where the defendant failed to investigate an apparently reliable source (*New York Times*, 376 U.S. at 287, 84 S.Ct. at 730; *Beckley Newspaper Corp. v. Hanks*, 389 U.S. 81, 84, 88 S.Ct. 197, 200, 19 L.Ed.2d 248 (1967); *Herbert v. Lando*, 781 F.2d 298, 308 (2d Cir.), *cert. denied*, —— U.S. ——, 106 S.Ct. 2916, 91 L.Ed.2d 545 (1986); *Bartimo v. Horsemen's Benev. and Protective Ass'n*, 771 F.2d 894, 898 (5th Cir.1985), *cert. denied*, —— U.S. ——, 106 S.Ct. 1635, 90 L.Ed.2d 181 (1986); *Wattigny v. Lambert*, 453 So.2d 1272, 1279 (La.App.3d Cir.1984)); and where the defendant disregarded apparently unreliable counter-evidence (*Long*, 618 F.2d at 1148; *Dougherty v. Capitol Cities Communications, Inc.*, 631 F.Supp. 1566, 1573–74 (E.D.Mich.1986)).

On the other hand, the courts have upheld findings of actual malice when a defendant failed to investigate a story weakened by inherent improbability, internal inconsistency, or apparently reliable contrary information. *Curtis Publishing Co. v. Butts*, 388 U.S. 130, 87 S.Ct. 1975, 18 L.Ed.2d 1094 (1967); *McHale v. Lake Charles American Press*, 390 So.2d 556, 566 (La.App.3d Cir.1980), *cert. denied*, 452 U.S. 941, 101 S.Ct. 3085, 69 L.Ed.2d 955 (1981). A verdict for the plaintiff has been upheld when a reporter's own notes showed that she was aware of facts contradicting her story. *Golden Bear Distributing Systems of Texas, Inc. v. Chase Revel, Inc.*, 708 F.2d 944, 950 (5th Cir.1983). Similarly, plaintiffs have prevailed after demonstrating that the author of a story knew facts disproving it (*McHale*, 390 So.2d at

561), or that the supposed source of the story disclaimed giving the information (*Batson v. Time, Inc.*, 298 So.2d 100 (La. App. 1st Cir.), *writ denied*, 299 So.2d 803 (La.1974)). When the only "source" of a story did not contain the statements supposedly derived from it, the courts have inferred that defendant recklessly fabricated the story. *Carson*, 529 F.2d 206. Refusal to retract an exposed error tends to support a finding of actual malice. *Golden Bear Distributing Systems*, 708 F.2d at 950. Conversely, a readiness to retract tends to negate "actual malice." *Hoffman v. Washington Post*, 433 F.Supp. 600, 605 (D.D.C.1977), *aff'd*, 578 F.2d 442 (D.C.Cir. 1978).

■ In a first amendment case, the appellate court must independently review the record. *Bose Corp. v. Consumers Union of United States, Inc.*, 466 U.S. 485, 104 S.Ct. 1949, 80 L.Ed.2d 502 (1984); *McKinley*, 777 F.2d at 1021. However, the factfinder retains its traditional role in the determination of facts, such as the credibility of witnesses. *Bartimo*, 771 F.2d at 898. The plaintiff must prove actual malice with "convincing clarity" (*New York Times*, 376 U.S. at 285–86, 84 S.Ct. at 729), and the Supreme Court has recently held that the plaintiff must sustain this burden to defeat a motion for summary judgment as well. *Anderson v. Liberty Lobby, Inc.*, —— U.S. ——, 106 S.Ct. 2505, 2514, 91 L.Ed.2d 202 (1986).

■ While the public figure plaintiff in a libel case must meet the "clear and convincing" standard of proof in order to defeat summary judgment, all of the other summary judgment rules still apply. *Anderson*, 106 S.Ct. at 2514. This means that the judge must deny summary judgment if the opponent shows any "genuine issue" of "material fact," and must draw all possible inferences in the opponent's favor. Fed.R.Civ.P. 56(c); *Anderson*, 106 S.Ct. at 2513. Generally, determinations of state of mind and of witness credibility are for the factfinder. *Anderson*, 106 S.Ct. at 2513–14; *Hutchinson v. Proxmire*, 443 U.S. 111, 120 n. 9, 99 S.Ct. 2675, 2680 n. 9, 61 L.Ed.2d 411 (1979) (proof of actual mal-

ice "does not readily lend itself to summary disposition"). The moving party must demonstrate the absence of genuine issues, but, as to issues on which his opponent would bear the burden of proof, the movant may obtain summary judgment by pointing to his opponent's failure to produce evidence. *Celotex Corp. v. Catrett*, —— U.S. ——, 106 S.Ct. 2548, 91 L.Ed.2d 265 (1986); *Fontenot v. Upjohn Co.*, 780 F.2d 1190 (5th Cir.1986).

■ Applying this somewhat complex legal scheme to the instant case, we find that the district court did not err in granting summary judgment to TSP Newspapers for publishing the March 14th story written by LeBlanc. LeBlanc may have been negligent in relying on his memory to write the story and in failing to investigate further. However, the precedents clearly establish that failure to investigate does not rise to the level of actual malice unless the story showed obvious inaccuracies. *See, e.g.*, *New York Times*, 376 U.S. at 287, 84 S.Ct. at 730; *Bartimo*, 771 F.2d at 898. The fact that editor Sims had to ask Zerangue what was inaccurate about the story when Zerangue called to protest tends to indicate that Sims did not know of the inaccuracy. In addition, Sims' readiness to print a retraction weighs against "malice." *Hoffman*, 433 F.Supp. at 605. Zerangue and Carriere showed the district court none of the other types of evidence that might justify a finding of actual malice. In sum, they failed to adequately oppose the motion under *Anderson, Celotex*, and *Fontenot*.

Much more difficult is the question of whether the district court correctly found no genuine issue as to TSP's malice in publishing the same error a second time on April 11. TSP's evidence in support of summary judgment included:

—Mary Dixon's statement that she was not aware of the March 15th retraction and felt no doubts about the truth of her story;

—The *Daily World*'s readiness to print a second retraction;

—The absence of any improbability on the face of the March 14th story that Dixon used as a source.

Zerangue and Carriere presented the following facts and inferences to oppose the motion:

—The original erroneous story, the first retraction, and the second erroneous story all appeared within thirty days in the same newspaper as part of a series of stories on the same subject (Danny Singleton);

—Mary Dixon worked in the same department of the same small newspaper as LeBlanc, Sims, and Kirgan, all of whom knew of the error;

—Mary Dixon may have attended a staff meeting at which the error was reviewed and discussed;

—The *Daily World* had a computer file of past stories which Dixon concededly consulted and which may have contained the March 15th retraction (despite Dixon's testimony that she failed to find it); and

—The April 11th story was edited, and given a headline, by one of two editors (Sims or Kirgan), both of whom knew of the March 15th retraction.

In *Anderson,* the Supreme Court stated that a public-figure libel plaintiff cannot defeat summary judgment "by merely asserting that the jury might, and legally could, disbelieve the defendant's denial ... of legal malice." 106 S.Ct. at 2514. In the instant case, Dixon's credibility is obviously crucial. However, Zerangue and Carriere have raised more than the possibility that a jury might disbelieve Dixon. They have produced some evidence concerning the *Daily World*'s operations and the close interrelation of events and people, from which a jury *could* infer the requisite knowledge or reckless disregard. Were this not a first amendment case, Zerangue and Carriere would have done enough to reach a jury.

First amendment cases are unique because our society places a high value on free discussion of public issues, and those who engage in that discussion are protected even when they make careless errors. *New York Times,* 376 U.S. at 279, 84 S.Ct. at 725. However, reputation is also a value, and the courts attempt, where possible,

to protect both freedom of speech and reputation. *Herbert,* 441 U.S. at 169, 99 S.Ct. at 1645. Balancing these two interests mandates that a publisher have clear first amendment protection from liability for the *first* nonmalicious publication of an erroneous story. However, once the publisher knows that the story is erroneous—as in the instant case—the argument for weighting the scales on the side of first amendment interests becomes less compelling. The *Daily World* could have adopted a policy of disseminating retractions widely or with certainty among newsroom staff, and of revising its computer files after each retraction. By contrast, it is difficult to see what more Zerangue and Carriere could have done, as outsiders, to prevent the erroneous story from resurfacing. As long as the original misinformation remained on the *Daily World's* computer file, it could be reprinted a third, a fourth, or a fifth time, each time only by "negligence." At some point, the effort required of the publisher is so slight, and the helplessness of the victim so great, that the balance of the scales tips.

■ Nor do we believe that the "clear and convincing" standard erected by *Anderson* in first amendment cases changes the result. *Anderson* is a recent case, and it does not describe the proof actually offered by the plaintiffs, so that we could compare it with the facts of the instant case. However, Justice Powell, writing for the majority, and Justice Rehnquist, dissenting, agree that *Anderson* does not change the allocation of responsibility between court and factfinder in summary judgment motions. 106 S.Ct. at 2514, 2521–22. For example, the drawing of inferences and the determination of credibility will still be a task for the factfinder. The present case hinges on just such determinations. While the question is close, we are constrained to hold that Zerangue and Carriere did produce enough evidence that the second erroneous article was published knowingly or recklessly to obtain a jury trial on the issue.

## C. *Substantial Truth*

 Truth is a defense to libel, and a libel plaintiff must prove that a publication is false before he can recover. *New York Times*, 376 U.S. at 279–80, 84 S.Ct. at 724–26; La.Rev.Stat.Ann. 13:3602 (West 1968 & 1986 Supp.). A publication is also protected if it is "substantially true," *i.e.*, if it varies from the truth only in insignificant details or if its "gist" or "sting" is true. *Otero v. Ewing*, 165 La. 398, 115 So. 633 (1927); *Bill Partin Jewelry, Inc. v. Smith*, 467 So.2d 188, 190 (La.App.3d Cir.1985). In determining whether the gist and sting of a story is true, the court must view the story through the eyes of the average reader or member of the audience. *Hopkins v. Keith*, 348 So.2d 999, 1002 (La.App.2d Cir.), *writs not considered*, 350 So.2d 893 (La. 1977); *Rosen v. Capital City Press*, 314 So.2d 511, 513 (La.App. 1st Cir.1975).

The district court refused TSP Newspapers a summary judgment on substantial truth, and TSP cross-appeals that ruling. The *Daily World* twice printed that Zerangue and Carriere "were found guilty" of releasing an inmate "in exchange for stolen goods." Appellee's Record Excerpts at 28, 30. In fact, the two men were convicted of malfeasance in office, a crime that involved only the unauthorized releases and that was classified as a misdemeanor. La.Rev.Stat.Ann. 14:134. In addition, Zerangue and Carriere were *indicted* for public bribery, a crime involving the receipt of things of value. La.Rev.Stat.Ann. 14:118. That indictment was quashed without trial. Neither man was indicted or convicted for the felony of receiving stolen things, as the story suggests. La.Rev.Stat.Ann. 14:69.

At the time of their criminal trial and throughout the present litigation, Zerangue and Carriere maintained that they released Singleton so that he could visit his family and so that he could help them with a burglary investigation. *See, e.g.*, Appellants' Reply Brief at 10. This contention was never disproven in the 1978 criminal proceedings, for malfeasance in office does not require that the defendant receive anything of value, and the public bribery charge never reached trial. Because this Court must draw all inferences favorable to the nonmovant when reviewing a motion for summary judgment, we must assume that Zerangue and Carriere did act from these motives and that the community could have believed that they did. In other words, Zerangue and Carriere's neighbors may have believed that the two deputies released Singleton out of misplaced sympathy and the desire to pursue a foolish method of criminal investigation.

The *Daily World* stories, however, implied that Zerangue and Carriere were convicted for receiving stolen goods. The difference between malfeasance in office and receiving stolen goods is more than the difference between a misdemeanor and a felony. If Zerangue and Carriere allowed a jail inmate to use the prison as headquarters for a burglary ring in return for a cut of the proceeds, they converted the sheriff's office into a center of criminal operations. A jury could believe that the "sting" or opprobrium of such an accusation is greater than the "sting" of a malfeasance charge. The *Daily World* stories could be viewed as converting a foolish and irresponsible betrayal of the public trust into a rapacious and calculated one.

TSP Newspapers cites several cases in which a defendant who misstated a plaintiff's involvement in the criminal justice system succeeded with a "substantial truth" defense. For example, in *Bill Partin Jewelry*, the defendants broadcast an allegation that the plaintiff had participated in a burglary. 467 So.2d 188. Actually, the plaintiff had been accused only of *receiving* burglarized property. *Id.* In *Sivulich v. Howard Publications, Inc.*, the defendant had printed that the plaintiff was "charged" with robbery. 126 Ill. App.3d 129, 81 Ill.Dec. 416, 466 N.E.2d 1218 (1984). The truth was that the plaintiff had been *civilly* sued for the same act. In *Bosley v. Hebert*, the plaintiff had been arrested for theft of a washing machine, but the defendant reported that he had been arrested for theft by issuing worthless checks. 385 So.2d 430 (La.App. 1st Cir.1980). In *Hamilton v. Lake Charles Am. Press, Inc.*, the defendant printed that the plaintiff was disbarred and convicted

for faking automobile accidents to defraud insurance companies. 372 So.2d 239 (La. App.3d Cir.), *writ denied,* 375 So.2d 943 (La.1979). Instead, the plaintiff's disbarment had been stayed pending appeals, and his conviction had been for mail fraud having to do with faked accidents. *Id.* In *Hopkins,* a newspaper printed that the plaintiff had been "convicted for running a gambling game." 348 So.2d at 1000. Actually, the plaintiff had been convicted for *gambling* and *indicted* for "running a gambling game," and had chosen to forfeit bail on the latter charge. *Id.* In *Rosen,* the defendants reported that the plaintiff—a doctor—was indicted for distributing narcotics, when he had instead been indicted for distributing illegal *stimulants.* 314 So.2d 511. Finally, in *Drury v. The Times Picayune Publishing Corp.,* a Louisiana district court absolved a newspaper reporting that the plaintiff had been convicted for defrauding his clients and insurance companies. No. 85–15368 (La.Dist. 1986) (unpublished opinion, reproduced at end of Appellee's Brief). The plaintiff had been indicted for defrauding both the insurance companies and his clients, but convicted only of defrauding the former. *Id.*

■ The common thread running through all these cases is that the defendant reported the substance of the criminal proceedings, but erred in the use of legal terminology. The man in the street would be likely to characterize the mistake as a "technicality." In these cases if the defendant's story had been free of error, the plaintiff would have been exposed to roughly the same amount of community opprobrium. Theft by writing bad checks "stings" no more than theft of a washing machine; direct fraud stings no more than mail fraud; running a gambling game stings no more than gambling. At the summary judgment stage in the instant case, the district court could not determine, as a matter of law, that Zerangue and Carriere's community would consider the error in the *Daily World* stories equally stingless. Thus the district court did not err in denying summary judgment on this issue.

## D. *Libel-Proof Plaintiffs*

■ TSP Newspapers argues that, as former law enforcement officers stripped of their offices and held in the jail they formerly supervised, Zerangue and Carriere's reputation had already sunk to such a low level as to render them libel-proof. The plaintiffs reply that the passage of six years had allowed them to improve their standing. In particular, they submitted four affidavits stating that Carriere had been seriously considered for the position of Chief of Police in Leonville, Louisiana, but that, "as a result of" the *Daily World* stories, he had withdrawn his name. Record Vol. 1 at 171–72, 177–82. TSP has produced no evidence to disprove this contention, arguing only that it is not believable. However, summary judgment is not an appropriate stage at which to resolve credibility questions. *Anderson,* 106 S.Ct. at 2513. The trial court did not err in reserving the question of whether Zerangue and Carriere were libel-proof for the jury.

## III. CONCLUSION

Because the plaintiffs, Zerangue and Carriere, have failed to produce evidence of actual malice in the printing of the March 14th news story, this Court affirms summary judgment for TSP Newspapers in regard to that story. However, the plaintiffs have raised a genuine issue as to actual malice in the printing of the April 11th story. Summary judgment as to that story is reversed, and the case is remanded for trial. The district court's refusal of summary judgment on the issues of whether the story was substantially true and the plaintiffs libel-proof is affirmed.

AFFIRMED IN PART; REVERSED IN PART; AND REMANDED.